L. J. KOCH, Administrator, Appellant, v. A. C. ROEHRIG, Appellee.

No. 41508.

OCTOBER 19, 1932.

B. F. Jones and Hollingsworth & Hollingsworth, for appellant.

Walker & Sheridan, for appellee.

ALBERT, J.—The only question involved in this case is the correctness of the ruling of the district court in directing a verdict for the defendant.

The particular automobile involved in this controversy was owned by the defendant, A. C. Roehrig, and at the time of the accident in controversy was being driven by his son, Jack Roehrig. The deceased, Glenn Koch, was riding with Jack at the time of the accident. A summary of the facts is: In the latter part of July, 1929,

the deceased, Glenn Koch, was operated upon for appendicitis and later taken to his home. The incision caused by the operation had not healed, though he had been riding in an automobile with his father or brother once or twice after the operation. On or about August 4, 1929, about noon or shortly thereafter, Jack Roehrig drove this automobile to the home of deceased's father and asked to take Glenn for a ride. Glenn's mother told Roehrig to drive slowly because Glenn's side had not entirely healed and to be careful about going over bumps. Jack said he would do so and be careful. He was driving the car with defendant's consent. It was an Essex roadster, capable of acquiring a speed of 80 miles an hour. Jack admitted that on some previous date he had driven it as high as 78 miles an hour on a slab road between Keokuk and the town of Montrose. On the day in question he had the top down, also the windshield "down flat" on the hood, about level with the top of the dash. After driving around Keokuk with the decedent for a short time, Jack drove out on the slab road known as No. 61, between Keokuk and Montrose. The accident occurred about three-quarters of a mile north of the village of Summitville.

One witness testified that he was driving his car northward at a rate of about 35 miles an hour and the Roehrig car passed him south of Summitville. He said: "I imagine he was going 45 to 50, something on that order." On cross-examination he said:

"I estimated they were going 30 to 35 miles an hour. I wouldn't exactly state that the car was going 50 miles an hour. It was going a little faster than I was. After he passed me I didn't notice; I didn't see him no more after he passed me. They were doing nothing unusual when they passed me. They were going at a pretty good clip. It didn't look like it was out of control or nothing at the time."

The evidence shows they passed another car which was going about 20 miles an hour and the driver of the latter car testified:

"I judge I was driving 15, 16, 18 or maybe 20 miles an hour. They passed me as nearly as I can recall right by the Presbyterian Church. That is just on the north side of Summitville. The car went by me like a whirl. They soon made distance between me and them. I noticed they went right around other cars ahead of me. The whirl of the car going by quickly, I said, 'There is somebody going over the road'."

As the Roehrig car proceeded northward, there were two cars very close together ahead of it, also headed northward. As the Roehrig car approached these two cars, Jack swung the car out to go around them, and about the same time the rear of these two forward cars turned to the left for the purpose of going around the forward car. About the time the front wheels and a part of the rear one of the two cars last referred to (being the car immediately in front of the Roehrig car) crossed the black line in the center of the slab, the driver thereof twice heard the squeaking and grinding of brakes a little behind him and a little to the left. On discovering the fact that the car immediately preceding him had turned to the left, Jack, as a witness for the plaintiff, testified:

. "I started to go around them and the man pulled out, so I drew back. I was quite a ways behind him. I took a long swing around him, and when I seen him go out, I went back. My car turned over. When the car ahead of me pulled out, I pulled back, because I saw I couldn't make it if he was going. That's all I remember. I was knocked unconscious at the time. I didn't sound my horn when I tried to pass that car."

The Roehrig car rolled over and turned around and both of the boys were thrown out onto the road and rendered unconscious, and young Koch died shortly after the accident.

The evidence shows that the effect of running a car with the windshield down where the wind can strike is to cause the eyes to water so one cannot see; that goggles are used for that reason because of the sand and dirt, and the effect on the eyes increases as the speed of the car increases. Roehrig wore no goggles.

The law governing cases of this kind is Section 5026-bl, Code, 1931, reading as follows:

"The owner or operator of a motor vehicle shall not be liable for any damages to any passenger or person riding in said motor vehicle as a guest or by invitation and not for hire, unless damage is caused as a result of the driver of said motor vehicle being under the influence of intoxicating liquor or because of the reckless operation by him of such motor vehicle."

The question therefore narrows itself down to whether the Roehrig car was being operated in a reckless manner, within the meaning of this section of the Code. The contention of appellant with respect to this matter is stated as follows:

"Recklessness is an inference of fact, the existence of which is to be determined by the jury from other facts, and it is for the jury to determine whether or not the evidence established the fact that the driver in question was operating the automobile recklessly as that term is defined by law."

What is meant by "recklessness" is defined in the cases of Siesseger v. Puth, 213 Iowa 164, and Neessen v. Armstrong, 213 Iowa 378. If we accede to the statement of the law made by the appellant, that recklessness is an inference of fact, the existence of which is to be determined by the jury from other facts, to our mind this rule will not avail the plaintiff, because he has not brought his case within the same. To make this rule operative, there must be a foundation of facts upon which to base such an inference, and if there be no such foundation, the plaintiff, of course, is not entitled to the inference and the benefit of the rule he suggests.

It is to be noted in addition that there is no evidence as to the speed of the Roehrig car at the time the accident occurred, nor is there any evidence as to the real cause of the accident. With this state of the record it is manifest that the plaintiff did not make out a case for the jury, and as applied to his contention, he made no foundation of facts from which an inference could be drawn such as he contends for, thereby making a question for the jury.

In addition to the cases heretofore cited, and as aiding us in this conclusion, see Kaplan v. Kaplan, 213 Iowa 646; Wilde v. Griffel, 214 Iowa 1177.

The court did not err in directing relief for the defendant.—Affirmed.

STEVENS, C. J., and FAVILLE, DE GRAFF and WAGNER, JJ., concur.